UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

Case No. 21-cr-20097

Honorable Nancy G. Edmunds

v.

XAVIER MATHIS,

    Defendant.

_____/

**OPINION AND ORDER GRANTING
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [19]**

Defendant Xavier Mathis is charged with one count of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g); one count of felon in possession of ammunition under 18 U.S.C. § 922(g)(1); and one count of possession with intent to distribute controlled substances under 21 U.S.C. § 841(a)(1). The matter is before the Court on Defendant's motion to suppress evidence. (ECF No. 19.) Defendant moves to suppress all evidence seized during an investigative stop and search of Defendant's vehicle and any additional evidence that is the fruit of that seizure. The government opposes the motion. (ECF No. 23.) A hearing on this motion was held on September 23, 2021. For the reasons that follow, the Court GRANTS Defendant's motion.

**I.**     **Background**

    **A. The Investigation**

The corner of Outer Drive and Fort Street is located in an area of Southwest Detroit known as "the Hole." At this intersection, both streets are divided highways with one-way traffic travelling in each direction on two sides of a grass median. Three businesses are

1

prominent here—a gas station, a pizza shop, and a party store—and pedestrian traffic frequently moves across the highways between the three.

Gang activity and drug trafficking are common in and around the Hole. According to the government, two street gangs are especially prevalent—the Anabelle Dawgs and the Hole Riders. From August to September 2020, a team made up of officers from the Detroit Police Department ("DPD") and Homeland Security Investigation ("HSI") were in the area investigating criminal activity. The investigation team, led by HSI Special Agent MacQuarrie ("SA MacQuarrie"), conducted surveillance in multiple locations around the Hole, spoke with individuals in the area, and followed up on police intelligence.

SA MacQuarrie conducted surveillance of the Outer Drive and Fort Street intersection on a daily basis during the ongoing investigation. He testified that he often saw "unkempt individuals" whom he believed, based on his knowledge and experience,[1] to be drug abusers. These individuals would frequently come out of the alley behind the pizza store, cross the road to the gas station or to the liquor store and then return to the alley. SA MacQuarrie saw discarded needles in the alley and people using drugs. He arrested one individual for possession of heroin in the alley. Nearby, he arrested another individual for possessing heroin and fentanyl with the intent to distribute.

B. The Man in the Red Baseball Cap

On August 31, 2020, SA MacQuarrie and other agents were conducting mobile surveillance of a specific Anabelle Dawgs member in the area around the Hole. SA

---

[1] SA MacQuarrie has significant law enforcement experience in the area of drug trafficking. He worked as a police officer from 1995 to 2001 where he was a member of his department's narcotics enforcement section, largely focusing on street-level drug crimes. From 2001 until 2010, MacQuarrie continued his drug work as a detective. He became a special agent with HSI in 2010 and focuses on higher-level drug trafficking. He has acted as an undercover agent in over 100 drug buys, the majority of which were street-level transactions. Based on his training and experience, he has been qualified as an expert witness in street-level drug crimes in various state and federal courts.

MacQuarrie was in his vehicle while air support surveilled from a helicopter flying above. At one point, air surveillance witnessed the suspect, driving in a dark sedan, stop on a residential street where a man in a red baseball cap approached the car and conducted what appeared to be a drug transaction. This transaction occurred just a few streets away from the intersection mentioned above. SA MacQuarrie did not see the transaction himself, but the air surveillance team informed him of what they had seen by radio.

### C. Surveillance of Defendant and Investigatory Stop

Two days after air surveillance witnessed the alleged drug transaction, shortly after 1:00 p.m., SA MacQuarrie was driving southwest on Fort Street just before the gas station and intersection with Outer Drive. Driving near him, he saw a silver Dodge pickup truck with a passenger who wore a red baseball cap. The red hat piqued his interest; once he saw it, he turned his vehicle left onto Outer Drive to pull into a concealed surveillance location that he had used before. This location was diagonal from the gas station approximately a quarter mile away. (*See* Exhibit P.) After situating his vehicle, he located his binoculars and used them to see the silver truck which had stopped at the gas station. The binoculars magnified his vision to be ten times that of the naked eye. (*See* Exhibit W.)

Through his binoculars, and through four lanes of lunch-hour traffic, SA MacQuarrie saw the silver truck parked at a gas pump, facing away from his location. An individual was standing near the outside of the truck as one would to pump gas. A pedestrian with an unkempt appearance then came across the street from the direction of the pizza store. He walked through the parking lot and went up to the individual near the silver truck.

3

From his vantage point, SA MacQuarrie states he could see the two individuals converse briefly then turn their shoulders toward each other. SA MacQuarrie's location did not allow him to see the individuals' hands or anything small being exchanged. He states he could only see part of the back of the individual on foot and part of the front side of the individual by the truck. A few seconds later, the individual on foot walked away.

SA MacQuarrie testified that he instantly suspected this to be a hand-to-hand drug transaction. He radioed the other agents and asked for assistance in investigating the occupants of the silver truck. SA MacQuarrie then left the surveillance area and followed the truck for approximately five to ten minutes after it pulled out of the gas station. During that time, he did not witness any traffic violations or run the license plate through a law enforcement system.

When the truck pulled into the parking lot of a coney island, SA MacQuarrie pulled in behind the truck initiating an investigative stop. An additional HSI agent and a police officer also stopped their cars to assist. SA MacQuarrie testified that he initiated the stop to find out who was in the truck, what they were doing, and to follow up on the narcotics investigation. This, he says, was based on the information he had from two days prior and what he observed at the gas station.

SA MacQuarrie approached the driver's side of the truck where he saw a man and a woman in the front seat. The woman, later identified as Defendant's wife, wore a red baseball cap. This was not the man in the red cap that air surveillance had witnessed two days prior. SA MacQuarrie asked the driver for identification and he provided a state identification card identifying him as Defendant, Xavier Mathis. Defendant explained his

driver's license was suspended. This was confirmed and Defendant was arrested for driving with a suspended license and placed in the nearby patrol car.

SA MacQuarrie then moved to the passenger side of the silver truck and began speaking with Defendant's wife. While they spoke, he saw an open bag of marijuana in plain view on the center console. The female passenger stated that the marijuana belonged to Mathis and was recreational. She was asked to step out of the car and once she did, officers proceeded to search the car. After the vehicle was searched and Defendant's wife was questioned, officers released the silver truck to her, and she was permitted to leave. Defendant was questioned following his arrest. He cooperated with police and made admissions that led to additional evidence and, eventually, Defendant's indictment.

### D. The Motion to Suppress

The search of Defendant's vehicle led to the discovery of drugs and other evidence. Defendant now moves to suppress the evidence found in the vehicle as well as all evidence collected as a result of the investigatory stop. SA MacQuarrie admits that all the evidence collected in this case, as well as Defendant's admissions, would not have been obtained if Defendant were not stopped for the suspected hand-to-hand sale. Defendant's motion and the suppression of all the evidence collected in this case therefore turns on whether SA MacQuarrie's investigatory stop was legal under the Fourth Amendment.

### II. Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects," including vehicles, "against unreasonable

searches and seizures." U.S. Const. amend. IV; *United States v. Snoddy*, 976 F.3d 630, 632 (6th Cir. 2020). The protections of the Fourth Amendment extend to a brief investigatory stop, or a *Terry* stop, of a vehicle. *United States v. Lyons*, 687 F.3d 754, 762 (6th Cir. 2012); *see also Terry v. Ohio*, 392 U.S. 1 (1968). Law enforcement officers may effectuate a *Terry* stop of a vehicle when they have reasonable suspicion of an ongoing crime or of a completed felony. *Gaddis ex rel. Gaddis v. Redford Twp.,* 364 F.3d 763, 771 n. 6 (6th Cir.2004) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003); *United States v. Roberts*, 986 F.2d 1026, 1029–30 (6th Cir. 1993); *United States v. Hensley*, 469 U.S. 221, 229 (1985)).

Reasonable suspicion "requires more than a mere hunch" but less than probable cause. *Lyons*, 687 F.3d at 763 (citing *Dorsey v. Barber,* 517 F.3d 389, 395 (6th Cir.2008)). It is an objective standard. *Terry*, 392 U.S. at 22. Simple good faith on the part of the officer is not enough. *Id.* Before an officer can conduct a *Terry* stop, he must "possess[ ] a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts." *Lyons*, 687 F.3d at 763 (citing *Dorsey,* 517 F.3d at 395).

When making a reasonable-suspicion determination, "the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Officers should "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Lyons*, 687 F.3d at 763 (quoting *Arvizu*, 534 U.S. at 273). Factors such as "the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time

6

of day during which the suspicious activity occurred" are all relevant to the analysis. *Id.* (quoting *United States v. Campbell*, 549 F.3d 364, 370-71 (6th Cir. 2008). When taken together as a whole, these factors may give rise to reasonable suspicion even if each factor individually is consistent with innocent behavior. *Id.* (quoting *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006)).

### III. Analysis

The Fourth Amendment requires that an officer's seizure of a person be based on specific and articulable facts, together with inferences from those facts, as understood by the law enforcement officer in light of his training and experience. *Lyons*, 687 F.3d at 763. Here, SA MacQuarrie has significant training and experience dealing with both street level drug transactions and higher level drug trafficking investigations. This experience allowed him to recognize the "unkempt man" and others around the intersection as likely drug abusers. He was also aware that drugs were frequently bought, sold, and used around certain businesses at the intersection although he testified that he never saw anyone using drugs on the gas station property.

The high crime area and ongoing investigation into the Anabelle Dawgs likely had SA MacQuarrie on high alert the day Defendant was stopped. At the suppression hearing, SA MacQuarrie explained that his attention was instantly drawn to Defendant's vehicle when he saw the red baseball cap worn by Defendant's passenger. This is because a man wearing a red cap had interacted with the suspect of SA MacQuarrie's investigation only two days prior. If HSI were able to stop or identify the man in the red cap seen by air surveillance, it would likely aid their investigation into the Annabelle Dawgs suspect.

7

Given the recent interaction between the Annabelle Dawgs suspect and the man in the red cap, it was Defendant's misfortune that he stopped in the Hole for gas on the day his wife wore a red baseball cap. But the circumstances described by SA MacQuarrie do not reasonably lead to suspicion of criminal activity.

Being in a high crime area is a relevant consideration in a reasonable suspicion analysis, but this consideration is not absolute. See *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."). Similarly, a red baseball cap and a brief conversation with a pedestrian while pumping gas in the middle of the day does not give rise to reasonable suspicion, even if the pedestrian appears to be a drug abuser.

The government argues there was reasonable suspicion based on the apparent hand-to-hand drug transaction. In *United States v. Paulette*, 457 F.3d 601 (6th Cir. 2006), the Sixth Circuit affirmed the district court's denial of the defendant's motion to suppress when officers developed reasonable suspicion the defendant was engaged in criminal activity "based upon his hand movements consistent with drug-dealing activity, efforts to evade the police upon noticing them, and presence in a high crime area." *Id.* at 606.

But, unlike in *Paulette*, SA MacQuarrie was not able to see any hand movements that would suggest a drug transaction had occurred. He surveilled the gas station from a quarter mile away and although he had binoculars, his position was too far to see the individuals exchange anything. Moreover, SA MacQuarrie looked upon the scene through four lanes of lunch-time traffic. As he stated at the suppression hearing, he could only see part of the back of the individual on foot and part of the front side of the individual by the

8

truck. He could not see their hands, did not see either person reach into his pocket to remove something, and did not see the exchange of drugs or currency.

Accordingly, the Court finds SA MacQuarrie stopped Defendant based upon a hunch— a hunch that Defendant made an unseen exchange of drugs and a hunch that Defendant's passenger was the man in the red cap who interacted with the investigation's main suspect two days prior. As SA MacQuarrie testified, he stopped Defendant's vehicle "to find out who was in the truck, what they were doing and to follow up on the narcotics investigation." As this does not constitute "a particularized and objective basis for suspecting [Defendant] of criminal activity based on specific and articulable facts," *Lyons*, 687 F.3d at 763, Defendant's motion to suppress is GRANTED.

## IV. Conclusion

For the reasons set forth above, Defendant's motion to suppress evidence is **GRANTED**.

SO ORDERED.　　　　s/Nancy G. Edmunds
　　　　　　　　　　　　Nancy G. Edmunds
　　　　　　　　　　　　United States District Judge
Dated: October 14, 2021


I hereby certify that a copy of the foregoing document was served upon counsel of record on October 14, 2021, by electronic and/or ordinary mail.

　　　　　　　　　　　　s/Lisa Bartlett
　　　　　　　　　　　　Case Manager

9